# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>        Respondent,<br><br>        v.<br><br>ANTHONY LEE ROBERT DAVIS,<br><br>        Appellant. | No. 79344-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

APPELWICK, J. — A police officer may search personal articles incident to arrest that are in an arrestee's actual and exclusive possession when the arrest process begins. When police officers contacted and detained Anthony Davis, he was holding a backpack. Formal arrest was delayed pending victim identification. Not until one officer drove away with Davis, did another officer at the scene search Davis's backpack. This was a valid search incident to Davis's arrest. We affirm.

## FACTS

A jury convicted Anthony Davis of robbery in the first degree and kidnapping in the first degree.

According to the evidence presented at Davis's trial, in April 2016, Jorden Smith was regularly engaged in the illegal sale of marijuana, primarily in concentrated form. He advertised his products on Craigslist.org and at that time, was offering to sell a gram of concentrate for $30, or four grams for $100.

Smith communicated with a potential buyer by text message and arranged to meet that person on April 17, 2016. Smith had previously met the same buyer, later identified as Davis, two days earlier and sold him 2 grams of concentrates. They arranged to meet at the same Alderwood Mall location where they had met before, in the parking lot of the H-Mart grocery store.

Davis asked to purchase $1,500 worth of cannabis products. When Smith arrived at the designated time, Davis was sitting in the passenger seat of a tan colored vehicle that Smith believed was a Nissan Pathfinder. Someone in the vehicle "waved" Smith over. Smith walked over, carrying a bag containing 2 trays of vials containing marijuana concentrates and three jars of flower marijuana. Smith sat in the back seat, on the driver's side.

Smith observed that the driver was a female with a tanned complexion and straight hair, who was wearing a fedora. Smith was able to see her side profile, but not fully able to see her face. Smith said that Davis, who was looking directly at him, was wearing glasses, had a tapered fade hairstyle, and a light complexion, similar to his own.

Smith displayed his products. After a brief silence, Davis said, "Popcorn." At that point, a third individual, a male, sprang up from the rear of the vehicle. He put Smith in a headlock. At the same time, Smith felt a hard object against his forehead. Smith looked up and saw that Davis was holding what appeared to be a firearm to his head.

2

The car began to move. Smith heard both Davis and the person in the rear say, "'If he's moving, we're going to have to . . . pop him.'" One of the individuals asked Smith if "it," presumably his merchandise, was worth "dying for." The person in the rear continued to hold Smith, while Davis continued holding the gun to his head. Davis went through Smith's pockets. He took Smith's phone, remarking that he did not intend to keep it, but did not want Smith to have his phone number.

The drive lasted from 10 to 20 seconds. The driver pulled up behind some stores. Davis got out and opened the rear door, while still holding the gun. Then, the person in the rear released his hold on Smith and shoved him out of the vehicle. Smith landed on his hands. The driver turned the vehicle around and Davis told Smith to "take a walk."

Davis got back in the vehicle and the driver drove away. Smith went to a nearby store and called the police. He realized that in addition to his telephone, he was also missing between $800 and $1,000.

Smith reported the incident to the police and provided the license plate number. However, because he was afraid of the repercussions of admitting to selling marijuana, Smith initially told the police that he was selling cosmetics.

The license plate number Smith provided was registered to an Infiniti QX-4, which has a similar body style to a Nissan Pathfinder, and was associated with an address in Bothell. Two Lynwood police officers, Warren Creech and Christopher Breault, went to the registered owner's Bothell address. The Infiniti

3

was parked in the driveway and the hood was warm to the touch. Within a couple of minutes, Davis and two other individuals matching the descriptions Smith had provided, emerged from the home. The officers approached them. The female was holding a tan purse and Davis was holding a backpack.

The officers detained and separated the three suspects. Davis set the backpack on the ground so that one of the officers could place him in handcuffs. Police held Davis and the others in front of the house for more than an hour, waiting for other officers to locate and transport Smith. In the meantime, Officer Creech observed, through the car window, a "revolver" on the front passenger floorboard of the Infiniti.

When officers brought Smith to the scene, he identified the female and the second male, with less than 100 percent certainty, as being the driver and the person in the rear who held him in a headlock. He said he was 100 percent certain that Davis was the front passenger who held a gun to his head.

After Smith identified Davis and the others, police officers arrested them. While another officer placed Davis in his patrol car and drove him to jail, Officer Creech retrieved Davis's backpack, placed it on the hood of his vehicle, and searched it. It contained a holster for a revolver and 40 small containers of a brown substance which smelled like marijuana. Smith identified the containers as identical to the ones taken from him. Police found additional containers of concentrated marijuana in the pocket of the individual that Smith identified as the person who held him in a headlock. A search of the residence uncovered

4

personal items belonging to Davis in one bedroom, along with additional matching containers in that room. When they searched the Infiniti, police recovered the weapon, which turned out to be a "BB gun revolver," and three jars of flower marijuana.

Upon his convictions, the sentencing court imposed an exceptional sentence below the standard range, based on Davis's age and lack of criminal history.

DISCUSSION

I. Search Incident to Arrest

Davis contends that the warrantless search of his backpack was not a valid search incident to his arrest and the court erred by denying his motion to suppress.

When reviewing the denial of a suppression motion, this court "determines whether substantial evidence supports the challenged findings of fact and whether the findings support the conclusions of law." State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). "Evidence is substantial when it is enough 'to persuade a fair-minded person of the truth of the stated premise.'" Id. (quoting State v. Reid, 98 Wn. App. 152, 156, 988 P.2d 1038 (1999)). We review de novo the trial court's conclusions of law regarding a motion to suppress. State v. VanNess, 186 Wn. App. 148, 154, 344 P.3d 713 (2015).

Generally, a warrantless search is prohibited by the Fourth Amendment of the United States Constitution and article I, section 7 of the Washington

Constitution.  Garvin, 166 Wn.2d at 249.  There are a few "'jealously and carefully drawn exceptions'" to the warrant requirement. Id. at 249-50 (quoting State v. Duncan, 146 Wn.2d 166, 171-72, 43 P.3d 513 (2002)). The State bears a heavy burden to show the search falls within one of the narrowly drawn exceptions. Id. at 250.

One exception to the warrant requirement is a search incident to arrest. State v. Brock, 184 Wn.2d 148, 154, 355 P.3d 1118 (2015).  There are two types of searches incident to arrest: "(1) a search of the arrestee's person (including those personal effects immediately associated with his or her person—such as purses, backpacks, or even luggage) and (2) a search of the area within the arrestee's immediate control."  Id.  "A valid search of the latter requires a justification grounded in either officer safety or evidence preservation—there must be some articulable concern that the arrestee can access the item in order to draw a weapon or destroy the evidence." Id.  By contrast, a search of the arrestee's person "presumes exigencies and is justified as part of the arrest." State v. MacDicken, 179 Wn.2d 936, 941, 319 P.3d 31 (2014).  Such a search requires no additional justification beyond the validity of the arrest itself.  State v. Byrd, 178 Wn.2d 611, 617-18, 310 P.3d 793 (2013).

In recent years, our Supreme Court has addressed the extent to which a search of a person incident to arrest extends to articles associated with the arrestee.  For instance, the defendant in Byrd was arrested for possession of stolen property after a police officer determined that the car she was riding in had

6

stolen license plates. Id. at 615. At the time of arrest, Byrd was sitting in the front passenger seat with her purse in her lap. Id. Before removing Byrd from the car, an officer took the purse from her lap and placed it on the ground nearby. Id. After securing Byrd in a patrol car, the officer searched the purse and discovered methamphetamine. Id.

Our Supreme Court held that a search incident to arrest extends to personal property "immediately associated" with the arrestee's person, and applied to the purse in Byrd's lap at the time of her arrest. Id. at 621, 623-24. The court cautioned that the exception does not apply to everything within an arrestee's "reach," but includes "only those personal articles in the arrestee's actual and exclusive possession at or immediately preceding the time of arrest." Id. at 623.

Two years later, in Brock, our Supreme Court further clarified the scope of this rule, known as the "time of arrest rule." Brock, 184 Wn.2d at 154. There, a police officer searched the backpack Brock was carrying when the officer approached him in a public park. Brock, 184 Wn.2d at 151. The officer first took the backpack from Brock for safety purposes and to facilitate a Terry[1] stop and frisk, and placed it in the passenger seat of a patrol vehicle. Id. at 151-52. After discovering that Brock had provided false information, the officer arrested him and searched the backpack. Id. at 152.

---

[1] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

Our Supreme Court concluded that Brock possessed the backpack "immediately preceding" his arrest even though he had been separated from the item for approximately ten minutes before his formal arrest. Id. at 158-59. The court stated,

> We hold that when the officer removes the item from the arrestee's person during a lawful Terry stop and the Terry stop ripens into a lawful arrest, the passage of time does not negate the authority of law justifying the search incident to arrest.

Id. at 159. The court observed that the "time of arrest" rule is informed by the "practical reality" that articles that are "part of the person" are also seized during an arrest and will travel with the arrestee into custody. Id. at 156. The court observed that this was so in the case of Brock's backpack: "Having no other place to safely stow it," it would be taken into custody. Id. at 159.

Here as in Brock, there is no dispute that Davis had actual and exclusive possession of his backpack when the arrest process began. Officer Creech testified at the CrR 3.6 hearing that the backpack was either in Davis's hands or slung over his shoulder when he first contacted Davis. Davis was separated from this backpack while detained and his detention later ripened into a lawful arrest. In these critical respects, Davis's case is indistinguishable from Brock.

Without challenging the court's conclusion that Brock is "directly on point," Davis argues that this case is materially different from Brock. He contends that here, (1) the search of his backpack was not contemporaneous with his arrest, and (2) the backpack was not transported to jail with him.

8

Police officers may conduct a contemporaneous warrantless search shortly after they have removed the arrestee from the immediate area, but the arrest and search should not be separated by a significant lapse of time or by intervening acts.[2]  See State v. Smith, 119 Wn.2d 675, 683-84, 835 P.2d 1025 (1992), abrogated on other grounds by Byrd, 178 Wn.2d at 623.  For instance, in Smith, an officer searched the arrestee's fanny pack at the scene of arrest approximately 9 to 17 minutes after handcuffing and placing him in the back of a police car.  Id. at 683.  The court held that the delay and the officer's intervening actions were reasonable and necessary to secure the premises and to protect the officer and the public; therefore, the search was not improper.  Smith, 119 Wn.2d at 683-84.

Likewise, here, the trial court found there was no significant delay between Davis's arrest and the search of his backpack.  The court also found that the search took place at approximately the same time that officers removed Davis from the scene of arrest.  Specifically, the court found that as soon as Smith made a positive identification, police officers placed Davis under arrest.  The court found that "[a]t approximately the same time" that other officers were transporting the three individuals to jail, Officer Creech retrieved the backpack from the place where Davis deposited it.  And finally, the court found that "just as

---

[2] Davis asserts that the right of police officers to search incident to arrest "evaporates" when the arrestee is removed to the scene.  But, his reliance on cases involving vehicle searches is misplaced.  See State v. Byrd, 178 Wn.2d at 619-20 (searches of a person incident to arrest are distinct from searches of the passenger compartment of a vehicle and rules circumscribing vehicle searches do not apply to a search of an arrestee's person).

Davis was either being transported or left the scene," Officer Creech searched the contents of the backpack.

Officer Creech's testimony supports these findings. He explained that he was personally unable to accompany any of the suspects to jail because he had a police K-9 in the back of his patrol vehicle. He testified that multiple officers were required to assist with transporting the three suspects from Bothell to the Lynwood jail. Once those officers arrived, they took over the task of monitoring Davis and the others. He then turned his attention to the scene and collected the backpack and the purse from the porch area. Officer Creech specifically testified that he retrieved the backpack "as [the suspects] were secured in the patrol vehicles." As he began to search the contents, he did not recall whether the arrestees were still at the scene in the patrol cars or whether they had just departed from the scene.[3]

While it is true that Davis and his backpack did not travel to the jail in the same patrol car, the evidence supports the court's unchallenged finding that having determined that the backpack was Davis's personal effect, Officer Creech intended to take it to jail. Officer Creech explained that the officers who arrived on the scene later to assist with transportation did not take any personal effects because they did not know which items were associated with the suspects. But, he, on the other hand, had "full awareness that those backpacks and purses had

---

[3] Officer Creech's narrative report was not inconsistent with his testimony. His statement that he first retrieved the backpack and "later" searched it simply describes the sequence of his actions and does not contradict his testimony indicating there was no lengthy delay.

been in their possession" and therefore, was in a position to make sure the correct items went to the jail with the suspects. Davis cites no authority that suggests a meaningful distinction between transporting a personal effect in the trunk of the same patrol car as the arrestee and transporting the article shortly after in a different vehicle.

Officer Creech explained that the suspects' personal effects could not be left at the scene because, having arrested the individuals, the police "would be responsible" for their personal effects. He said it was necessary to search the contents of the backpack because those items "were being taken into [his] police vehicle and then back to the police station." Officer Creech testified that a search was required to ensure that he would not inadvertently introduce any "hazards" into his vehicle, the jail, or the evidence facility.

Davis contends there were no exigencies requiring an immediate search of his backpack and maintains that the police officers could have included the item in their application for a search warrant. He also claims it was unnecessary to take his backpack into custody, because, unlike Brock, he was not arrested in a public location. He suggests that officers could have safely left his property in the care of the homeowner. And, because police officers saw him emerge from the home, he asserts that his "personal connection" to the residence was clear.

But, again, the presence of exigent circumstances is unnecessary to justify the search of a personal article at the time of arrest because "exigencies are presumed when officer searches an arrestee's person." Byrd, 178 Wn.2d at

11

620. And, as a factual matter, there is nothing in the record to indicate that police officers had any information about the nature of Davis's connection to the residence.[4] Davis cites no authority that requires police officers to explore other potentially viable options to store an article of the person upon arrest. The court rejected a similar argument in Byrd:

> Byrd cites no authority for the claim that she could have shed the purse after being placed under arrest, and her proposed rule has no limits. If an officer cannot prevent an arrestee from leaving her purse in a car, what of other personal articles, such as an arrestee's jacket, a "baggie" of drugs, or a concealed firearm? We reject Byrd's claim and hold that if [the officer] had authority to seize Byrd and place her under custodial arrest, he also had authority to seize articles of her person, including her clothing and purse that were in her possession at the time of arrest.

Byrd, 178 Wn.2d at 624. In other words, the time of arrest rule cannot be avoided merely because, hypothetically, an item could be left behind. The authority to seize and search stemmed from Davis's actual possession of the backpack at the outset of the arrest process and his subsequent lawful arrest. No further justification is required.

Because the backpack was an article of Davis's person when the police contacted and detained him, it was within the scope of the search incident to arrest. The trial court did not err in denying Davis's motion to suppress evidence discovered in the search of his backpack.

---

[4] It was only after searching the home that police discovered mail and clothing belonging to him in one of the bedrooms.

12

II.    Sufficiency of the Evidence

Davis challenges the sufficiency of the evidence to support his conviction of kidnapping.  Specifically, he argues that the State's evidence was insufficient to prove that he "abducted" Smith.

Due process of law requires the State to prove every element of a charged crime beyond a reasonable doubt in order to obtain a criminal conviction.  State v. O'Hara, 167 Wn.2d 91, 105, 217 P.3d 756 (2009).  "The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt."  State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).  "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom."  Id.  Circumstantial evidence and direct evidence are equally reliable.  State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).  "Credibility determinations are for the trier of fact and cannot be reviewed on appeal."  State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

As charged here, in order to convict Davis of kidnapping, the jury had to find that he "intentionally abduct[ed]" Smith with intent to facilitate the commission robbery or flight thereafter.  RCW 9A.40.020(1).  According to the statute, a person may abduct by (1) secreting or holding another in a place he or she is unlikely to be found, or (2) using or threatening to use deadly force.  RCW

9A.40.010(1).   In this case, the State relied on only the second means of abduction and the court instructed the jury as follows:

> Abduct means to restrain a person by using or threatening to use deadly force.
>
> Restraint or to restrain means to restrict another person's movements without consent and without legal authority in a manner that interferes substantially with that person's liberty.

See RCW 9A.40.010(1).

Davis argues that holding Smith in a headlock, pointing an apparent firearm at his head, and threating to kill him, were the means to accomplish robbery.   He contends that, apart from this conduct directed toward the goal of taking Smith's property, any restraint was minimal.   He cites the fact that Smith entered the vehicle willingly, he estimated that the drive lasted no more than 20 seconds, and the car travelled only a short distance.   Although Davis does not use the term "incidental," his analysis appears to be based on a now-abrogated interpretation of State v. Green, 94 Wn. App. 216, 226-28, 616 P.2d 628 (1980) (characterizing movement and restraint of the victim as incidental and finding evidence insufficient to establish abduction by secretion or holding where unlikely to be found).[5]   As our Supreme Court made clear in State v. Berg, 181 Wn.2d 857, 860-61, 337 P.3d 310 (2014), where the State charges kidnapping and robbery separately, whether a kidnapping is "incidental" to a robbery is immaterial.

---

[5] See e.g. State v. Korum, 120 Wn. App. 686, 702-03, 86 P.3d 166 (2004) (interpreting Green as establishing due process standard that evidence of kidnapping is insufficient if it is incidental to another crime), affirmed in part and reversed in part, 157 Wn.2d 614, 141 P.3d 13 (2006).

14

To the extent that Davis argues that the facts are comparable to those in Green, he fails to appreciate that Green involved the sufficiency of evidence to prove abduction by a different means. The question in that case was whether the evidence was sufficient to support a finding that the defendant secreted or held the victim where she was unlikely to be found. Green, 94 Wn. App. at 226. In determining that the evidence was insufficient, the court relied on the short duration of time, the fact that the victim was moved an insubstantial distance, the "clear visibility" of the location, and lack of isolation from "open public areas." Id. These factors are not relevant to whether Davis and his accomplices restrained Smith by force or threat of force. And, the fact that Smith initially entered the car voluntarily does not affect the sufficiency of the evidence to establish restraint by force and threats of deadly force. See State v. Mines, 163 Wn.2d 387, 392, 179 P.3d 835 (2008) (evidence sufficient to support kidnapping conviction although the victim voluntarily entered the assailants' vehicle).

The State presented the following evidence of restraint. Triggered by a code word, Davis's accomplice placed Smith in a headlock. Then, while Smith was being held in this manner, Davis placed what appeared to be firearm to his forehead. Davis and the person holding Smith in a headlock threatened to kill Smith if he moved. Davis and his accomplices drove him from a visible location in the front parking lot of a store to a presumably more secluded location behind the stores. The person in the rear of the vehicle continued to hold Smith in a headlock until the vehicle stopped. When Davis opened the door, still pointing

the apparent firearm at Smith, Davis's accomplice shoved Smith out the vehicle. Viewing the evidence in the light most favorable to the State, as we must, a rational juror could find beyond a reasonable doubt that Davis and his accomplices substantially interfered with Smith's liberty by restraining him through force and the threat of deadly force.

Affirmed.

_Appelwick, J._

WE CONCUR:

_Brummer, J_  _Leach, J._